

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

> This Opinion
> Overrules Opinion
> O - 185

Honorable L. A. Woods
State Superintendent of Public Instruction
Austin, Texas

Dear Sir:

                    Opinion Number O-5423
                    Re: Interpretation of provisions
                        of 1943-1945 rural aid bill
                        (Acts 1943, 48th Leg., R.S.,
                        H. B. 176)

        We have before us your letter of June 23, 1943, in
which you ask five specific questions relating to the 1943-
1945 rural aid bill. Your first question is quoted as fol-
lows:

        "(1) Article 1, Section 2 states in part,
    'Provided that the tax provisions and other in-
    hibitions provided in said Act shall not apply
    to the school where the Alabama Indians attend-
    ed school in Polk County, Texas.' QUESTION: It
    is my understanding that some of these Indians
    have attended school at various places. What
    is the effect of the use of the word INHIBITION,
    and to which school in Polk County would this
    provision apply?"

        Section 2, Article I of the Act makes certain require-
ments concerning the levying of taxes. Section 2 reads as fol-
lows:

        "Section 2. TAX LEVY. No school district shall
    be eligible to receive any type of aid authorized

Honorable L. A. Woods, page #2

under the provisions of this Act unless it
shall be providing for the annual support of
its schools by voting, levying and collecting
for the current school year a local maintenance
school tax of not less than Fifty Cents (50¢)
on the one hundred dollars of property valua-
tion in the entire district. The property
valuations shall not be less than said prop-
erty is valued for state and county purposes.
The income from such maintenance tax in excess
of the required Fifty Cents (50¢) maintenance
tax must first be used to retire indebtedness,
if any, in the local and Equalization (Rural
Aid) school funds. After the indebtedness in
these funds, if any, has been retired the in-
come from this maintenance tax in excess of the
required Fifty Cents (50¢) maintenance tax may
be used at the discretion of the local school
authorities of the district for any lawful school
purpose. Any or all maintenance tax above Fifty
Cents (50¢) may not be included in the calcula-
tion of need for aid but shall be reported in
the budget. If the income from the maintenance
tax above Fifty Cents (50¢) is not spent as pre-
scribed herein, it shall be included as receipts
in the budget. In order to comply with the terms
of this section, it shall be necessary for such
school districts applying for any type of aid
authorized under the terms of this Act, to re-
port all valuations within such districts in-
cluding all consolidated districts and annexed
districts and failure to report all such valua-
tions shall prevent such district from receiving
any type of aid authorized under this Act. Pro-
vided that the tax provisions and other inhibi-
tions provided in said Act shall not apply to
the school where the Alabama Indians attended
school in Polk County, Texas."

As we understand it, there is a school district in Polk
County, Texas, the Indian Village district, for the Alabama

Honorable L. A. Woods, page #3

Indian scholastics to attend. This district is supported to a large extent by the Federal Government. There is no taxable property in the district; consequently, there can be no tax levied by the district. It is, therefore, obvious that the "school" refers to the Indian Village School and only to said school.

We understand that there are around 90 scholastics in the district. It, therefore, comes within the 20-500 scholastic limitation set out in Section 1 of Article I. We think that the words "other inhibitions" are directly modified by the words which immediately precede the same; namely, "tax provisions." In other words, "other inhibitions" refer to the tax requirements and the other requirements related thereto: i.e., report of valuations, etc.

As "other inhibitions" appears in Section 2, it would seem, therefore, that any exception provided for therein would be limited to that section. In this instance, if we gave "other inhibitions" a broader application than the one stated above, the result would be something indefinite and vague and unsusceptible to any clear meaning.

Our interpretation is consistent with the general purpose of the Act: to aid districts needing the same and to equalize the educational facilities. Article 6 provides that no aid shall be given unless it can be shown that such aid is "actually needed as shown by the approved budget and actual expenditures and that the funds are being used as approved."

An interpretation of "other inhibitions" other than the one we have announced might involve the question of discrimination if aid not actually needed were granted.

Your second question reads as follows:

"(2) Article 2, Section 2 states in part that 'Schools whose applications for state aid are

Honorable L. A. Woods, page #4

filed later than October 1st of each year for which aid is asked, shall be ineligible for any type of aid.' QUESTION: Does this statement make such ineligibility definite and positive beyond any decision or action on the part of the Department or any other body?"

Section 2 of Article 2 provides in full as follows:

"Section 2. FILING DATE. All applications for any type of aid authorized herein, except tuition aid, shall be on file with the State Department of Education in Austin not later than October 1st of each scholastic year for which aid is asked. Schools whose applications for state aid are filed later than October 1st of each year for which aid is asked, shall be ineligible for any type of aid." (Emphasis supplied.)

It is a general rule of statutory construction that statutory provisions which are affirmatively worded and merely set forth the time or mode for the proper or orderly conduct of business are not mandatory. But the same is not true where such provisions are negatively worded, or are followed by words of limitation, showing that such time or mode is exclusive.

In the leading case of City of Uvalde v. Burney, 145 S. W. 311, a statute, which provided that the city council "shall, on or before the first day of January . . . fix the salary and fees of office of the mayor . . . ", was under consideration. The salary of the mayor had not been fixed until April. The question was whether the statute was mandatory or directory — whether the order in April fixing the salary was effective. The court held, in effect, that where a statutory provision is in affirmative words, it does not necessarily mean that the mode or time mentioned in it is exclusive, and that as the provision under consideration was in affirmative words, the same was merely directory.

But the court made a further holding which we think is especially applicabld here. The same statute providing for the fixing of the mayor's salary also provided that "the compensation so established shall not be changed during the term for which said officer shall be elected or appointed." (Emphasis supplied) The court held regarding this provision:

"That provision is negatively expressed, and must necessarily be mandatory."

See also the case of Ferris Press Brick Co. v. Hawkins, 116 S. W. 80, wherein a similar rule was announced:

"The act under consideration does not provide that a failure to observe its directions with regard to the time a statement of facts shall be presented . . . shall forfeit any right; nor is it its phraseology such that the designation of the time within which such presentation shall be made must be considered as a limitation of the power of such judge in approving and directing the statement to be filed."

And from the opinion of the court in the case of Gomes v. Timon, 128 S. W. 656, we quote the following:

" : "A clause is directory when the provision contains mere matter of direction and no more; but not so when followed by words of positive prohibition." Bladen v. Philadelphia, 60 Pa. 466; Pearce v. Morris, 2 Ad. & El. 96. Prohibitory words can rarely if ever be directory. There is but one way to obey the command "thou shalt not," which is to abstain altogether from doing the act forbidden.' "

Thus, the general rule is well-established that statutory provisions affirmatively worded and setting forth the time

in which an act is to be done are usually directory; but where the provision is negatively worded or contains negative words restraining the doing of the act after such time, the provision is mandatory. See the recent case of Markowsky et al. v. Newman et al., (Sup. Ct.), 136 S. W. (2d) 800, affirming this rule.

Now, let us apply these principles to Section 2, Article 2 of the rural aid bill. Section 2 does not simply read: "Application shall be on file by October 1st." It goes much further and is much stronger, for it reads:

"All applications for any type of aid authorized herein, except tuition aid, shall be on file with the State Department of Education in Austin NOT later than October 1st of each scholastic year for which aid is asked. Schools whose applications for state aid are filed later than October 1st of each year for which aid is asked, SHALL BE INELIGIBLE for any type of aid." (Emphasis ours.)

This provision is clearly in negative language. Provision is made that the applications shall be filed not later than October 1st. Even so, the Legislature was not satisfied with this alone, for it added the provision that schools whose applications are filed later than October 1st shall be ineligible for any kind of aid.

This provision is not only in negative words, but it also contains a positive prohibition or limitation. The provision is, therefore, mandatory. You are, therefore, advised that Section 2 makes the ineligibility positive and definite beyond any decision or action on the part of the Department of Education or any other body.

The Legislature has in the plainest and most positive language made a definite determination that October 1st is the

Honorable L. A. Woods, page #7

deadline for the effective filing of all applications for aid except tuition aid. Any conclusion other than the one which we have reached would be, in effect, holding that the Legislature is powerless to set a time within which applications must be filed. The absurdity of such a conclusion is apparent.

Opinion No. 0-185 dealt with a similar provision in the 1937 rural aid bill. With respect to the 1943 Act, any holding in that opinion which may be inconsistent with the view stated in this opinion is hereby expressly overruled, and said Opinion No. 0-185 is modified accordingly.

Your third question reads as follows:

"(3) Article 6 provides for the duties of the State Superintendent, but it also indicates that the Legislative Accountant is to act concurrently. QUESTION: Does this Legislative Accountant appointed by the Legislative Committee to act in lieu of said Committee have the constitutional power of administration in the distribution of the money, or does said Accountant have the function of a post-auditor only and is to audit the distribution of the funds by the State Superintendent? If your answer is in the affirmative, what specific administrative functions does the Constitution permit the legislature to assign such employed Legislative Accountant named in the Act?"

This question requires serious consideration in view of our Opinion No. 0-4609, wherein it was held that the part of the 1941 rural aid bill purporting to impose on the Joint Legislative Advisory Committee the authority to administer the law was unconstitutional because of Section 1 of Article II, Constitution of Texas, which provides as follows:

Honorable L. A. Woods, page #8

"The powers of the Government of the State of Texas shall be divided into the three distinct departments, each of which shall be confided to a separate body of magistracy, to-wit: those which are legislative to one; those which are executive to another, and those which are judicial to another; and no person, or collection of persons, being of one of these departments shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."

It was stated in Opinion No. O-4609:

"It is the function of the legislative branch of the government to make the laws; it is the function of the executive branch of the government to administer and execute these laws. In the statute under consideration, the Legislature of the State of Texas has undertaken not only to declare that the law shall be, which is clearly its prerogative, but has also undertaken to clothe a portion of the membership of the Legislature, the Joint Legislative Advisory Committee, with the authority to execute and administer the law passed by the Legislature. Under Article 2, Section 1, of the Constitution of the State of Texas, the Legislature is powerless to clothe itself, or a portion of its members, with executive authority."

In the Act under consideration provision is made for the appointment of an officer by the Joint Legislative Committee. Such officer is to be known as Legislative Accountant, and certain duties are specified in the Act for him to perform. Most of these duties were covered in the 1941 Act, but were to be performed by the Committee. Such is not the case here, however; and it seems to us that the only constitutional question involved

is the validity of the mode of appointment of the Legislative Accountant -- whether such appointment may be made by a legislative committee or whether the power of appointment is fundamentally executive and, therefore, under Section 1 of Article II of the Constitution cannot be exercised by the Legislature.

Sections 1 and 2 of Article 12 of the rural aid bill read as follows:

"Section 1. There is hereby created a Joint Legislative Committee composed of five (5) members of the Senate, appointed by the President of the Senate, and five (5) members of the House of Representatives, appointed by the Speaker of the House of Representatives, a majority of which shall constitute a quorum for the purpose of discharging any duty imposed upon said committee. Said committee shall promptly organize and select from its membership a chairman, a vice chairman and a secretary, shall vote as a unit on all propositions coming before it for consideration and shall keep a permanent record of its proceedings. The members of said committee shall receive no compensation for the services performed under the provisions of this Act, but each shall receive his actual and necessary expenses incurred in the discharge of his duties as such member."

"Section 2. Within thirty (30) days after the appointment of this committee, it shall meet and appoint a Legislative Accountant to perform the duties set forth in this Act. Said Legislative Accountant shall be appointed and hold office for a period of two (2) years or until his successor is appointed and qualifies. The Joint Legislative Committee, or a majority of the membership thereof, shall execute a written appointment of the person so appointed, as such Legislative Accountant, and cause the same to be filed in the office of the

Secretary of State. All vacancies in the office
of the Legislative Accountant shall be filled by
the committee or a majority of the membership
thereof." (Emphasis supplied.)

We are of the opinion that the appointment of a Legis-
lative Accountant by the Joint Legislative Committee, as out-
lined in Section 2 above, is constitutional.

The general rule relative to the power of appointment
is stated in 12 C. J., 836-837, as follows:

" # # # By the great weight of authority, how-
ever, the power of appointment is held not to be
per se an executive function, and unless the ap-
pointment of particular officers is, by the con-
stitution, expressly conferred on the executive
department or forbidden to the legislature the
latter may, by statute, vest the power of appoint-
ment in its discretion. The ordinary constitution-
al distributive clause providing for the complete
separation of governmental powers has generally
been held insufficient to vest the appointing
power solely in the executive."

The Supreme Court of Maryland in the case of Mayor, Etc.
of Baltimore v. State ex rel. Board of Police of Baltimore, 15
Maryland, 376, 74 Am. Dec. 572, had before it the constitution-
ality of an Act of the Legislature wherein certain commissioners
were appointed by the Legislature. We quote the following from
the opinion of the court:

"It is contended that, the power of appoint-
ment being an intrinsic executive function, the
naming of the commissioners in the law was in
violation of the sixth article of the declaration

Honorable L. A. Woods, page #11

of rights, 'that the legislative, executive, and judicial powers of government, ought to be forever separate and distinct from each other, and no person exercising the functions of one of said departments shall assume or discharge the duties of any other.'

"We are not prepared to admit that the power of appointment to office is a function intrinsically executive, in the sense in which we understand the position to have been taken; namely, that it is inherent in, and necessarily belongs to, the executive department." * * * "

And the following is quoted from the opinion of the Supreme Court of Oregon in State v. Compson, 54 P. 349:

" * * * * But this identical question has twice been held adversely to relator's contention by this court, and can therefore no longer be regarded as an open one. Biggs v. McBride, 17 Or. 640, 21 Pac. 878; Eddy v. Kincaid, 28 Or. 537, 41 Pac. 156, 655. The effect of these decisions is that the fundamental law of the state, so far as it relates to the legislature, is a limitation, and not a grant of power, and, this being so, the legislative assembly may exercise any of the powers of sovereignty not prohibited, and that the appointment of persons to office is within the domain of the lawmaking department (People v. Hurlbut, 24 Mich. 44); or, as is said by Mr. Chief Justice Murray in People v. Langdon, 8 Cal. 1: 'The power to fill an office is political, and this power is exercised in common by the legislatures, the governors, and other executive officers of every state in the Union, unless it has been expressly withdrawn by the organic law of the state.' Mr. Justice Lord, in State v. George, 22 Or. 142, 29 Pac. 356, commenting upon the powers of the several departments of state, says: 'While our constitution

Honorable L. A. Woods, page #12

separates the powers of government into three
distinct departments, and prohibits any of
them from exercising any powers confided to
the other, it does not undertake to declare
what shall be considered legislative, execu-
tive, or judicial acts.'

"Notwithstanding some contrariety of judi-
cial utterance in relation to the power of a
legislative body to appoint persons to office
may be found to exist, we think, under a con-
stitution like ours, which does not prohibit
such appointments, the rule announced in Biggs
v. McBride, supra, is founded in reason and un-
assailable upon principle."

The similarity between the constitutional provision
of these states to ours is apparent, and it is our opinion
that the same result would be reached by our courts.  This
conclusion is largely reached from a study of our constitu-
tional provisions themselves.

Section 18 of Article III, Constitution of Texas, pro-
vides in part as follows:

" * * * *; no member of either House shall,
during the term for which he is elected, be
eligible to any office or place, the appoint-
ment to which may be made, in whole or in part,
by either branch of the Legislature; and no
member of either House shall vote for any other
member for any office whatever, which may be
filled by a vote of the Legislature, except in
such cases as are in this Constitution provided."

Clearly, this language is a recognition by the framers
of the Constitution that the Legislature may exercise the power

Honorable L. A. Woods, page #13

of appointment. If such power is exercised "in whole," then the action of no one else would be required.

Our Constitution and statutes contain provisions for the joint action of the Governor and the Senate in making certain appointments. See Article 4, Section 12, Constitution of Texas (Vacancies in state and district offices); Article 5737 (Adjutant General); Article 2907 (A & M and University of Texas boards); Article 342 (Banking Commissioner); Article 601 (Board of Control); Article 666-5, P.C. (Liquor Control Board); Article 6166b (Prison Board); Article 7478 (Board of Water Engineers); Article 3207a (Commission for Blind); Article 6664 (Highway Commission); Article 4679a (Board of Insurance Commissioners); Article 7009 (Livestock Commission); Article 4330 (Secretary of State).

We held in Opinions No. O-1092 and O-3996 that under Section 18 of Article III confirmation of an appointment by the Senate was part of the appointment.

It is seen, therefore, that the Legislature is authorized to exercise the power of appointment and has been doing so for quite some time.

In the case of Miller v. El Paso County, 146 S.W. (2d) 1027, reversed on other grounds, 150 S. W. (2d) 1000, the court considered a statute which, among other things, provided for a board of county development. The Act confided the appointment of said board to the Directors of the Chamber of Commerce, and it was claimed that this feature of the Act was in violation of Section 1, Article II of the Constitution. We quote the following from the opinion of the court:

"The Texas Relief Commission was provided for by Chapter 37, First Called Session, 43d Legislature, 1933, p. 113, Vernon's Ann. Civ. St. Art. 842b. By the terms thereof the commission of nine provided for were selected and to be selected as

Honorable L. A. Woods, page #14

follows:  Chairman of the Industrial Accident
Board, President of the Judicial Council; three
to be appointed by the Lieutenant Governor, three
by the Speaker of the House of Representatives,
and one by the Governor.  A member of that Com-
mission had been appointed by the Speaker of the
House.  A short time after the appointment the
Speaker decreed the removal of such appointee
and made another appointment, such subsequent
appointee taking the oath and undertaking to
qualify.  Quo warranto proceedings were insti-
tuted by the State against the last appointee.
The trial court sustained the quo warranto pro-
ceedings, and, in effect, ordered the first ap-
pointee reinstated.  The case reached the Supreme
Court on certified questions.  Dorenfield v. State,
123 Tex. 467, 73 S. W. 2d 83.  The judgment of the
trial court was in effect approved.  It is true,
the question of the validity of the appointment
of the prior appointee, Holliday, was not dis-
cussed--only the validity of his attempted re-
moval was involved.  However, it was clearly and
unequivocally stated that Holliday, by his ap-
pointment by the Speaker of the House, became a
State officer.  It is true that the Speaker of
the House is an officer of the State; in respect
to the functioning of the legislative branch of
the government, an executive officer.  However,
he is in all respects an officer of the legis-
lative branch of the government, and his power
and function is as such.  In this case, it is
true, the appointing power was exercised by one
elected by the people, or rather by their repre-
sentatives.  However, he was not elected with the
contemplation that he should exercise other than
legislative functions.  As stated, the court did
not discuss, but assumed the legality of Holliday's
appointment.  But the legality of his appointment
was by the judgment vindicated.  We do not deem
Dorenfield v. State, supra, as conclusive here, but
think that it has considerable bearing.

# # # # # # # # # #

Honorable L. A. Woods, page #15

"The division of governmental powers into
three departments is common to most, if not all,
of the State Constitutions. Provision against
the exercise by one division of power entrusted
to another is likewise characteristic.

"In several cases in jurisdictions other than
ours the legality of the delegation of the power
of nomination and appointment to nonofficial
bodies has been recognized. 46 Corpus Juris,
pp. 950, 951; McCurdy v. Jessop, 126 Md. 318,
95 A. 37; In re Dulger, 45 Cal. 555; Overshiner
v. State, 156 Ind. 187, 59 N. E. 469, 51 L.R.A.
748, 83 Am. St. Rep. 187; State v. Sowards, 64
Okl. Cr. 430, 82 P. 2d 324; Bradley v. Board of
Zoning Adjustment, 255 Mass. 160, 150 N. E. 692.

"In principle we can see little difference in
confiding the power of appointment to an office
other than the executive department and confiding
it to an unofficial body."

In view of the foregoing you are advised that it is
the opinion of this department that the mode of appointment
of the Legislative Accountant, as set out in Article 12 of the
rural aid bill is valid and constitutional.

It is our further opinion that the Constitutional ob-
jections to the Joint Legislative Advisory Committee under the
1941 Act and discussed in Opinion No. 0-4609 are not applicable
to the Joint Legislative Committee created by the 1945 Act. The
duties imposed on said committee by the 1943 Act are set forth
in Sections 2 and 5 of Article 12 of the Act. Under Section 2
of Article 12 the committee is to appoint the Legislative Ac-
countant. Section 5 provides as follows:

"Section 5. Immediately after the close of each
fiscal year it shall be the duty of the Legislative
Accountant to make a detailed report of his work to

the Joint Legislative Committee. The Joint Leg-
islative Committee shall consider such report and
make recommendations based thereon to the next
regular session of the Legislature thereafter.
Said Committee is also directed to study the
school laws in order that same said laws may be
recodified and make recommendations thereon to
the next Legislature."

It was held in Opinion No. O-4609 that the part of
the 1941 Act creating the Committee "for the purpose of study-
ing the school laws of the State in order that said laws may
be recodified is clearly constitutional. Torrell v. King, 118
Fed. 237, 14 S. W. (2d) 786." We think that the Act in provid-
ing for the making of reports to the committee by the Legisla-
tive Accountant so that the committee may make recommendations
to the next regular session of the Legislature is likewise con-
stitutional, for the Legislature may act on the basis of such
recommendations in making subsequent rural aid appropriations.

You ask about the administrative duties of the Legis-
lative Accountant under the Act. We shall summarize the duties
of the Accountant as set forth in the various provisions of the
Act.

Section 1 of Article 1 makes certain districts eligible
for aid for only one teacher unless a geographical barrier in
the district necessitates the operation of two schools, "such
geographical barrier to be determined by the State Department
of Education and subject to the approval of the Legislative Ac-
countant." (Emphasis supplied.)

Section 4 of Article 1 makes certain provisions regard-
ing the average daily attendance required of schools coming with-
in the terms of the Act. This provision reads that the required
percentage of such attendance shall be based for the entire school
term or, "at the election of the school and with the approval of

Honorable L. A. Woods, page #17

the Legislative Accountant, may be based upon the first four months thereof." (Emphasis supplied.)

Section 1 of Article 3 sets forth the teacher-pupil quota forming the basis for the grant of salary aid. Provision is made for an adjustment of the number of teachers upon an increase of enrollment under certain conditions; such adjustment is to be made by the State Superintendent and on the approval of the Legislative Accountant.

Section 2 of Article 5 provides that no transportation aid shall be granted, under the conditions therein specified, unless the bus routes have been approved by the State Department of Education and confirmed by the Legislative Accountant.

Section 3 of the same article provides that "a school requesting transportation aid on a student who is not an approved scholastic of his home district, shall list such students separately on the application; giving such information as may be requested by the Department of Education and the Legislative Accountant."

Article 6 reads in part as follows:

"It shall be the duty of the State Superintendent of Public Instruction, and the Legislative Accountant, to take such action and to make such rules and regulations not inconsistent with the terms of this Act as may be necessary to carry out the provisions and intentions of this Act, and for the best interest of the schools for whose benefit the funds are appropriated."

Article 9 deals with the disbursement of funds under the Act. Section 1 of Article 9 reads as follows:

Honorable L. A. Woods, page #18

"Section 1. Warrants for all money granted under the provisions of this Act shall be approved and transmitted by the State Superintendent of Public Instruction to treasurers of depositories of school districts to which aid is granted in the same manner as warrants for State apportionments are now transmitted. Initial payment of not more than fifty per cent (50%) of salary aid, tuition aid, and transportation aid may be made by the State Superintendent of Public Instruction after September 1 of each year of the biennium as soon as a basis for payment can be determined, and approved by the Legislative Accountant. Final payment by warrant of the total amount allotted to any one school shall then be made not later than June 1, or as early as possible thereafter after the approval and upon the order of the State Superintendent of Public Instruction and the Legislative Accountant. Such final payments shall be made on a percentage basis so that each school approved for aid will receive the same proportion of aid."

Section 4 of Article 12 provides as follows:

"In addition to the other duties conferred upon the Legislative Accountant by this Act, it shall be his duty to audit all applications for aid, after same have been passed on by the State Department of Education, and when such application has been approved by said Department, it shall then be the duty of the Legislative Accountant to approve, or reject such application as the provisions of this Act may require. The Legislative Accountant shall have access at all times to all of the books, accounts, reports and other records of the State Department of Education pertaining to the administration and enforcement of this law, and also shall have access to the records of all school and bank depositories thereof."

We have already mentioned Section 5 of Article 12 with respect to the report of the Legislative Accountant to the committee.

Article 13 of the Act makes the appropriation and allocation of the funds. Section 1 of Article 13 states that the money is allocated and expended under the provisions of the Act by the State Department of Education and under the supervision of the Legislative Accountant.

Section 2 of Article 13 allocates the money and provides for the salary of the Legislative Accountant. It also provides for the transfer of any unexpended balance in an allocation at the end of the first year of the biennium "by order of the State Superintendent of Public Instruction and the approval of the Legislative Accountant" to any allocation created by the Act.

We have briefly reviewed the various provisions relating to the duties of the Legislative Accountant. His duties are concerned largely with checking the work of the State Department of Education. Most of such work is initiated by the State Department and its officers, and then the action of the State Department is subject to confirmation or approval by the Legislative Accountant.

Of course, there are instances where the two authorities should act together. For instance, in Article 6 it is made the duty of both to formulate rules and regulations. If the Legislative Accountant makes certain determinations which would affect his approval or rejection of an application after the same has been passed on by the State Department, then the two authorities should attempt to work out and eliminate any disagreement or inconsistency in policy.

This is about as definite an answer as we can give to the general type of question asked. If a specific question arises, then if you will ask our opinion as to such question, we will be glad to advise you.

Honorable L. A. Woods, page #20

Your fourth question reads as follows:

"(4) Article 8 states in part, 'and the sending contracting district will be eligible for as much salary aid as is necessary to supplement the State Available and Local Maintenance funds, on the scholastics from the sending district attending a school in the receiving district, to cover the approved cost of instruction per scholastic in the receiving school, provided that such approved cost shall not exceed Seven Dollars and Fifty Cents ($7.50) per month for five (5) months for high school students or Five Dollars ($5.00) per month for five (5) months for elementary students.' QUESTION: Does this language limit the approved cost of instruction for state available, local maintenance, and salary-aid funds to $37.50 for high school students and $25 for elementary students to those districts contracted to non-state-aid schools?"

Article 8 of the bill authorizes, under certain conditions, the transfer of the entire scholastic enrollment of a school district unable to maintain a satisfactory school to an accredited school of higher rank. Where the transfer is made to a school district not a state-aid school, the following provision, quoted from Article 8, is applicable:

" * * * If the receiving school is not a State aid school, the scholastic census rolls both white and colored shall be combined, the per capita apportionment shall be paid direct to the receiving school, all local taxes of the sending contracting district except those going to the interest and sinking fund shall be credited to the receiving school by the tax collector as collected, and the sending contracting district will be eligible for as much salary aid as is necessary to supplement the

Honorable L. A. Woods, page #21

State Available and Local Maintenance funds, on
the scholastics from the sending district attend-
ing a school in the receiving district, to cover
the approved cost of instruction per scholastic
in the receiving school, provided that such ap-
proved cost shall not exceed Seven Dollars and
Fifty Cents ($7.50) per month <u>for five (5) months
for high school students</u> or Five Dollars ($5.00)
per month <u>for five (5) months</u> for elementary stu-
dents." (Emphasis added.)

This provision is identical to the 1941 provision ex-
cept for the addition of the words "for five (5) months" under-
scored above. At first glance it would appear that the total
cost of instruction is limited to $37.50 for high school stu-
dents and $25.00 for elementary students. But we are convinced
that this was not the intent of the Legislature. On the other
hand we think that such amounts were intended to be limitations
on the amount of the approved cost toward which aid could be
granted under Article 8. Of course aid may be granted only if
and to the extent that need is shown. Opinion No. O-5237.

The 1941 Act contained the $7.50 and $5.00 limitations,
but did not contain the five months limitation. The figures of
$37.50 for high school students and $25.00 for elementary students
are the maximum amounts (on a monthly basis of $7.50 and $5.00
respectively) toward which aid may be granted under the bill.

We have arrived at this conclusion, first, from a con-
sideration of the Act itself. A similar limitation appears in
the high school tuition grant.

Moreover, a short time before the Legislature passed the
rural aid bill, it passed House Bill No. 257 which, among other
things, raised the limit of the State per capita apportionment
to $25.00. (See also House Bill No. 256.) Therefore, if the
approved cost of instruction from all funds were limited to
$25.00 for elementary students and the amount of per capita ap-
portionment is $25.00, then no aid could possibly be granted

Honorable L. A. Woods, page #22

for such students, for that part of Article 8 quoted above provides that "the per capita apportionment shall be paid direct to the receiving school."

The same Legislature enacted both House Bill No. 257 and the rural aid bill. It knew the provisions of said House Bill No. 257 when the rural aid was passed. It is a fundamental canon of statutory construction that the Legislature will not be presumed to have done a vain and foolish thing.

The emergency clause of House Bill No. 257 reads in part as follows: "The fact that the present law fixes a maximum for the per capita apportionment which is in conflict with the formula prescribed in said law, and the further fact that the public schools of the State have been unable to retain their trained teachers and operate their schools for the minimum of six (6) months, as required by the Constitution of Texas, create an emergency * * *." Section 2 of Article 3 of the rural aid bill provides in part: "All schools of the accredited class receiving aid shall provide a term of approximately nine (9) months, and schools of the unaccredited class shall provide a term of approximately eight (8) months." The difference between the purposes of the two laws is thus apparent.

In view of the foregoing you are advised that your question is answered in the negative.

Your fifth and last question reads as follows:

"(5) You will note that the Act makes provision for teachers for resident scholastics (Salary Aid), provides transportation for pupils either to their own school or to another school (Transportation Aid), and makes provision for tuition to another school when their grade is not offered in the home district (High School Tuition). QUESTION: Does the Act permit the granting of either of these types of aid to any district except upon

Honorable L. A. Woods, page #23

the basis of approved budgetary need as provided
for in the Act, such approved budgetary need to
be determined by the authorized salary schedule
plus the $100 per teacher for all other current
expenses?"

You have told us that the question in which you are
interested is whether need must be shown before aid is grant-
ed. We think that the answer to this question is plainly in
the affirmative. Section 1 of Article 2 provides in part:

"The total amount of approved expenditures
less the total amount of receipts will be the
amount of Salary Aid to which a school will be
eligible; * * * ". (Emphasis supplied)

The granting of salary aid is to be guided by Article 3 of
the Act with respect to the teacher-pupil quota and the salary
schedule and length of term.

Article 4 provides that certain funds are to be used
to pay high school tuition "not to exceed Seven Dollars and
Fifty Cents ($7.50) per pupil per month, and in no instance
shall more than five (5) months tuition be paid for any one
pupil on the census roll for any one school year. * * *"(Em-
phasis supplied).

Article 5 (Transportation Aid) reads in part as fol-
lows:

"The expense of such transportation shall be
paid on the basis of budgetary need as indicated
by approved State aid application, out of the
funds herein allocated for transportation aid,
not to exceed Two Dollars and Twenty-five Cents
($2.25) per month per pupil for those attending
the most convenient accredited high school and
not more than One Dollar and Seventy-five Cents
($1.75) per month per pupil for those transport-
ed to elementary schools; * * * " (Emphasis sup-
plied).

Honorable L. A. Woods, page #24

Section 1 of Article 2 reads in part as follows:

"The expenditure will include salaries of teachers as determined by the salary schedule stated herein, and a maximum of One Hundred Eighty Dollars ($180) per teacher per year in accredited schools and One Hundred Sixty Dollars ($160) per teacher per year in unaccredited schools for other current expenses; * * * "   (Emphasis supplied)

Article 6 among other things provides that:

" * * * No aid shall be given unless it can be shown that all provisions of this Act have been complied with and that such amount of aid actually needed as shown by the approved budget * * * " (Emphasis supplied)

We think it clear from these provisions that need must be shown before aid may be granted, and based upon such need aid may be granted only to the amount of need shown, but in no event in excess of the maximum amounts set by the Act.

APPROVED AUG 3, 1943

FIRST ASSISTANT
ATTORNEY GENERAL

Very truly yours,

ATTORNEY GENERAL OF TEXAS

By George W. Sparks
Assistant

GWS-s

ok
c.c.R.


APPROVED
OPINION
COMMITTEE
BY BWB
CHAIRMAN